2004 SD 90

In the Interest of D.M., R.M. III, and T.B.C., Minor Children, and concerning R.M., Jr., and S.C.B.C.-M., Respondents and Appellants.

In the Interest of B.B.C., Minor Child, and concerning L.P.L., Respondent,

and

S.C.B.C.-M., Respondent and Appellant.

No. 23060.

Supreme Court of South Dakota.

Considered on Briefs on June 01, 2004.

Decided July 28, 2004.

Patrick M. Ginsbach of Farrell, Farrell and Ginsbach, Hot Springs, South Dakota,

Attorneys for appellant Mother S.C.B.C.-M.

Lynn A. Moran, Custer, South Dakota, Attorney for appellant Father R.M., Jr.

Lawrence E. Long, Attorney General, Ann M. Holzhauser, Assistant Attorney General, Department of Social Services, Pierre, South Dakota Attorneys for appellee State.

SABERS, Justice.

[¶ 1.] Parents appeal the trial court's determination that there was good cause to deny the Rosebud Sioux Tribe's (Tribe) motion to transfer termination proceedings under the Indian Child Welfare Act (ICWA). 25 USC § 1912(b). We affirm.

## FACTS

[¶ 2.] This case is before the Court for the third time. The first time was in 2003, when Parents appealed an order terminating their parental rights.[1] Mother is an enrolled member of the Rosebud Sioux Tribe and children in this case fall within the provisions of ICWA. In their first appeal, Parents argued in relevant part that the trial court erred in denying the Tribe's motion to transfer jurisdiction. The trial court denied the motion to transfer in the first instance because the Tribe failed to file a motion to transfer until a month after the dispositional proceedings were commenced and over a year after the Tribe's initial motion to intervene. At a hearing shortly after receipt of the Tribe's motion to transfer, the trial court informed the parties that it would consider the motion to transfer at a later hearing and directed the parties to prepare memoranda on the issue. At the subsequent hearing, the trial court held, without taking evidence or hearing arguments, that the proceedings were at an advanced stage when the motion was filed and therefore good cause existed to deny the transfer. After noting that "the parties were presented with an opportunity to argue their positions on this issue to the trial court" and "[t]here [was] nothing in the record to indicate that any further evidentiary hearings were even requested," we affirmed the trial court's determination. *D.M. I*, 2003 SD 49 at ¶ 16, 661 N.W.2d at 773.

[¶ 3.] Parents petitioned for rehearing, arguing that our decision failed to address the issue whether the Tribe was properly notified of the dispositional hearing and whether a hearing should have been held concerning the petition to transfer. Parents further asserted that the Tribe was not permitted an opportunity to present witnesses or introduce evidence on the issue and that only the Tribe would be able to offer any evidence regarding why it delayed in filing its petition to transfer. We granted the petition for rehearing on limited grounds and entered an order remanding the matter to the trial court for the "limited purposes of holding a hearing, and for reconsideration of, the motion to transfer to tribal court, with instructions to effectuate proper notice to the Indian Tribe of the hearing to be scheduled on the motion to transfer." *In re DM*, 2003 SD 49, 665 N.W.2d 83, 84 (*D.M.II*). Our per curiam opinion was issued but it was stayed "until further consideration by this Court pending a final determination by the trial court on remand." *Id.*

[¶ 4.] The transfer hearing was held on August 28, 2003. The State, the Department of Social Services (DSS), Mother, Tribe, through its counsel, and Father, through his counsel, appeared at the hearing. Parents and the attorney for the children submitted proposed findings of fact and conclusions of law. The court

1. For a complete factual recital, see, *In re D.M.*, 2003 SD 49, 661 N.W.2d 768 (*D.M.I*).

adopted those submitted by the attorney for the children and on October 30, 2003, entered an order denying the Tribe's petition to transfer the proceedings to tribal court. Parents appeal, arguing the trial court erred in finding good cause to deny the petition for transfer.

## STANDARD OF REVIEW

[¶5.] We review a trial court's findings of fact for clear error. *People in interest of K.C.*, 414 N.W.2d 616, 619–20 (S.D.1987) (citation omitted). Denial of a motion to transfer jurisdiction under 25 USC § 1911(b) is reviewed under the abuse of discretion standard. *People in re S.G.V.E.*, 2001 SD 105, ¶28, 634 N.W.2d 88, 93.

[¶6.] **WHETHER THE TRIAL COURT ERRED IN FINDING DELAY AS GOOD CAUSE TO DENY TRIBE'S PETITION FOR TRANSFER PURSUANT TO THE INDIAN CHILD WELFARE ACT.**

[¶7.] The Tribe was notified that the State was proceeding in an abuse and neglect action against Parents with regard to three of the children in early January 2001. The notice informed the Tribe that it had a right to intervene and request an additional 20 days to prepare, that the Tribe had the right to petition the court for transfer, and the date of the hearing. The Tribe filed a notice of intervention on March 7, 2001. The parties' fourth child came into Mother's custody after the first three children were removed. Upon Mother's refusal to take the child back to his grandfather's home, DSS removed the

child. An abuse and neglect petition was filed with regard to the fourth child on July 17, 2001. The Tribe's motion to intervene was filed on August 9, 2001, and was granted on August 10, 2001. The children were adjudicated abused and neglected on October 26, 2001, nunc pro tunc June 22, 2001. DSS began efforts to conduct home studies on family members for potential placement.

[¶8.] In November 2001, the State sent a letter to the Tribe that indicated that since Parents were currently cooperating with the reunification plan, it did not intend to seek termination and that a hearing scheduled for late November would be a permanency, rather than a termination hearing.[2] Testimony elicited from the Tribe's ICWA specialist indicated that she was in regular contact with DSS regarding the children and DSS' efforts at reunification. When reunification efforts proved futile, State pursued termination of parental rights. The ICWA specialist was notified shortly thereafter.

[¶9.] A dispositional hearing was set for and held on June 28, 2002 and continued on July 12, July 31 and August 9, 2002. The Tribe filed its motion to transfer on July 29, 2002.

[¶10.] In cases implicating ICWA wherein a tribe, a parent or Indian custodian requests transfer of the case to Tribal court, the State court must transfer the case unless a parent objects or there is "good cause to the contrary." 25 USC § 1911(b). The Bureau of Indian Affairs

---

**2.** The letter provided in part, "the hearing regarding the [] children on November 30th is now a [permanency] hearing rather than an adjudicatory hearing, and [] we do not plan to terminate [] parental rights [] at this time." The letter went on to provide that the information the State's Attorney had was that Parents were cooperating with DSS and that

"[a]s long as this pattern of cooperation continues we will not proceed with the termination."

It is clear from the record that the State's Attorney misspoke when referring to an "adjudicatory" hearing as the children had already been adjudicated abused and neglected and the next step was disposition.

(BIA) Guidelines for ICWA suggest several criteria for determining whether there is good cause to deny transfer. Good cause for denying transfer may occur where:

1. the proceeding is at an advanced stage when the petition to transfer is received and the petition is not promptly filed after receipt of notice;

2. the Indian child is over the age of twelve and objects to the transfer;

3. evidence necessary to decide the case cannot be adequately presented to the tribal court without undue hardship to witnesses and parties;

4. the parents of an Indian child over the age of five are not available and the child has had little or no contact with the child's tribe or members of the child's tribe[.]

*In re J.L.*, 2002 SD 144, ¶ 12, 654 N.W.2d 786, 790 (citing Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67.586, ¶ C.3(b)). We have noted, "[c]ase law also suggests that 'good cause to the contrary' includes the absence of a tribal mechanism for handling child custody matters." *Id.* The burden of establishing good cause is on the party opposing transfer. *Id.*

[¶ 11.] Parents argue that the trial court abused its discretion in finding good cause to deny transfer because the Tribe did not receive formal notice of the dispositional hearing.

[¶ 12.] 25 USC § 1912(a) provides in part:

In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. [] No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided,* that the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

In *S.G.V.E.*, 2001 SD 105 at ¶ 28, 634 N.W.2d at 93, we affirmed a trial court's finding of good cause when the Tribe failed to make a timely motion to transfer. In that case, the Tribe was notified by certified mail that an abuse and neglect petition had been filed. The Tribe also received and signed for notices regarding subsequent hearings in the matter. The Tribe did not move to transfer the case until after termination of the mother's parental rights. We held that there was no abuse of discretion in the trial court's determination that there was good cause to deny the transfer because of the advanced stage of the proceedings at the time the Tribe filed its motion. *Id.* We have cited with approval a case which held that there was no abuse of discretion in denying transfer when the motion was made six months after the Tribe received notice, which was on the first morning of the dispositional hearing. *S.V.G.E,* 2001 SD 105 at ¶ 27, 634 N.W.2d at 93 (citing *In re Wayne R.N.*, 107 N.M. 341, 757 P.2d 1333 (1988)).

[¶ 13.] We have also held that substantial compliance with notice requirements and actual notice to the Tribe of proceedings is sufficient under the statute. *In re A.L.*, 442 N.W.2d 233, 236 (S.D.1989).

[¶ 14.] The Tribe's ICWA specialist testified that she had been in regular contact with DSS and that they had dis-

cussed the possibility of termination, a possibility that "became more official when we got the Court notice for the hearing date." She further testified that from at least March of 2002, the Tribe had been discussing the possibility of transferring the case but had decided to "hold this and watch the case and wait for a little longer." The ICWA specialist also testified that she was given actual notice of the impending dispositional proceeding by a letter from Mother's attorney to the Tribe dated April 29, 2002. On May 3, 2002, the State's Attorney served the ICWA specialist by fax with a motion requesting continuance of the dispositional hearing. A DSS caseworker testified that she had conversations with the Tribe's ICWA specialist wherein she informed the specialist that the State was moving to terminate rights and also informed of the dates of the dispositional hearing. At the dispositional hearing, the Deputy State's Attorney informed the judge that she had faxed the Tribe notice of the June 28 dispositional hearing on June 7, 2002. The Tribe did not appear at the dispositional hearing. The evidence is clear that within the first days of May, the Tribe had actual notice of the dispositional hearing.

[¶ 15.] The Tribe began discussing the possibility of transferring the case as early as March 2002, but the Tribe's ICWA board did not move to transfer the case until mid or late July. The ICWA specialist indicated that the reason they did not move to transfer the case earlier was because they did not have a placement for the children.

[¶ 16.] The evidence supports the determination that the Tribe had actual notice of the proceeding and that it was not prevented by the actions of the State from requesting transfer. In fact, the evidence is clear that the delay in requesting transfer was based on the Tribe's apparent inability to find a placement for the children until after it received notice that the State was pursuing termination. Parents have failed to establish that the following findings by the trial court were clearly erroneous:

As early as January 2001, in File No. 01–01, and July 2001, in File No. 01–46, the Rosebud Sioux Tribe was aware termination of parental rights was a possible disposition of these proceedings.

[I]n March, 2002, the Rosebud Sioux Tribe told the Department of Social Services [that] the Tribe was considering transfer.

[P]rior to May, 2002, the Rosebud Sioux Tribe had unofficial notice from the Department of Social Services of the Department's recommendation seeking termination of parental rights.

[A]round May 1, 2002, the Rosebud Sioux Tribe officially realized the State was seeking termination of parental rights.

[A] meeting of the ICWA board did not occur until July, 2002.

[I]n May, 2002, the Rosebud Sioux Tribe began making greater efforts to find a placement for the children.

[P]rior to May, 2002, the Tribe did not have a placement for the minor children and so failed to file a Motion to Transfer these proceedings.

[T]he motion to transfer [in File No. 01–01] was not filed with this court until after 17 months [had] elapsed since the [Tribe's] knowledge of this proceeding and½ way through the final disposition hearing seeking termination of parental rights.

[T]he motion to transfer [in File No. 01–46] was not filed [] until after 11 months [had] elapsed since the [Tribe's] knowledge of this proceeding and½ way through the final dispositional hearing.

[G]ood cause exists to deny transfer of these proceedings to tribal court under 25 U.S.C. 1911(b) as the [Tribe's] motions to transfer came at an advanced stage and [the Tribe] did not file the motions to transfer promptly after receiving notice of the proceedings.

[G]iven the time that has elapsed, transfer of these proceedings would be detrimental and disruptive to the children's best interests.

25 U.S.C. § 1912(a) is ambiguous as to whether notice via registered mail, return receipt requested is necessary only at commencement of the proceedings or prior to every hearing. Under the facts and circumstances of this case, we decide it was not necessary prior to every hearing. The Tribe had actual notice of the pending dispositional hearing, and by faxing notice of the hearing to the Tribe, the State substantially complied with ICWA. Furthermore, the testimony elicited from the Tribe's witness makes clear that the reason for the delay in making the motion to transfer was not due to the State's failure to adequately notify the Tribe. The delay was attributable to the Tribe's decision to wait and see what happened in the proceedings and the Tribe's decision to wait to make a motion to transfer until after it found a placement for the children. The trial court was not clearly erroneous in finding that the motion was made at an advanced stage in the proceeding.

[¶ 17.] As noted above, one of the BIA guidelines for ICWA provides that there may be good cause to deny transfer if the Indian child is over twelve years of age and objects to the transfer. Parents argue that the trial court abused its discretion in finding good cause because the twelve year old child, BBC, did not object to the petition to transfer, and the attorney for the other minor children did not object. This argument is without merit.

[¶ 18.] First, at the time the motion was filed, none of the children were twelve years old. The eldest child did not turn twelve until February 3, 2003.

[¶ 19.] Second, although the guidelines allow a finding of good cause to deny transfer based on the child's objection, there is no indication that the trial court is prevented from finding good cause based on a lack of objection by the child.

[¶ 20.] Third, the argument that the children did not object to transfer is tenuous given that the Findings of Fact and Conclusions of Law adopted by the court to deny transfer were drafted and proposed by the children's attorney.

[¶ 21.] Parents' final assertion is that the trial court erred in finding good cause because the State did not file any objection to the transfer at the time the Tribe served its motion to transfer. The State's written objection to the transfer was dated August 26, 2003, thirteen months after the motion to transfer, and it objects to transfer on the basis that the motion was untimely. ICWA does not require written objections to a motion to transfer. We observe that the BIA guidelines indicate that the objecting party must provide a written explanation for its belief that there is good cause to deny the request. We have noted that the BIA Guidelines are interpretive rather than binding. *A.L.*, 442 N.W.2d at 236. Therefore, the State's untimely filing of its written objection is insufficient cause to hold that the trial court abused its discretion in denying transfer. However, it would be much better practice for the objecting party to immediately file its objection to the motion to transfer indicating reasons for good cause to deny the transfer. In this case, the objection was filed before the hearing on the motion to transfer and, at the time of the hearing, Parents and Tribe were well

aware of the State's reasons for opposing transfer.

[¶ 22.] The four children in this case have been denied permanency for well over a year because the State and the Tribe failed to act in accordance with the best interests of the children. The petition for rehearing in this case had to be granted in order to provide the Tribe notice and an opportunity to present evidence on its motion to transfer; an opportunity it was denied in the first instance by the complete lack of notice that the court would be considering the transfer motion. Furthermore, the State's failure to ensure that the Tribe received timely, official notice of the dispositional hearing in this case was negligent at best. The only indication that the Tribe, a party to the proceedings, had notice *from the State* that it intended to pursue termination was the State's Attorney's statement that she faxed notice to the Tribe. No copy of the notice appears in the record. Our holding that the Tribe received actual notice of the proceeding is based upon the testimony of the DSS worker that she informed the ICWA specialist of the hearings and the Parents' concession that children's attorney sent a letter notifying the Tribe of the proceedings. The notice provisions of ICWA are not suggestions that the State may choose to follow whenever it is convenient. The language and spirit of ICWA require more active efforts by the State to keep tribes informed. The State must put forth its best effort to include tribes in all of the proceedings which involve a Native American child unless a parent has objected or the Tribe has made unequivocally clear its intention not to pursue intervention and transfer. This is especially so when the hearing will address a tribe's motion to transfer. The State's responsibility in this regard should not end with sending initial notice of the proceedings. Once the Tribe intervenes, it is imperative that it be informed of hearings affecting custody and placement of the Indian child.

[¶ 23.] The Tribe is no less culpable in the needless prolonging of this case. There is simply no good reason for the delay in making the motions to transfer. In one case, the Tribe was aware of the proceedings 17 months before it moved to transfer. In the other case, the Tribe was aware of proceedings 11 months before moving to transfer. Waiting until the proceedings have advanced to near finality does nothing to promote the laudable objectives of the Indian Child Welfare Act and works only to prevent a timely and acceptable conclusion to these cases. Affirmed.

[¶ 24.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and MEIERHENRY, Justices, concur specially.

KONENKAMP, Justice (concurring specially).

## I.

[¶ 25.] The dilemma we face today arises all too frequently when a potential for termination of parental rights occurs in an ICWA case. Understandably, many tribes, often having limited resources, do not want to move children into their court systems unless it appears that termination of parental rights is inevitable and a tribal court placement will be required. Tribes are also reluctant to transfer cases if they do not have viable placement opportunities available. Circuit courts, not wanting to prolong disruption, decline to transfer children to another court system if a child's case has been pending for a long time and is about to reach permanency. Beyond any doubt, both sides have children's best interests in mind.[3]

---

**3.** The term "best interest of the child" has a     broadened meaning under ICWA, incorporat-

[¶ 26.] ICWA, through 25 USC § 1911(b), requires a state court to transfer child custody proceedings to tribal court upon the petition of a parent or the child's tribe, unless either parent objects or the court finds good cause to the contrary. The Act does not define good cause. Nonetheless, the BIA Guidelines offer examples of good cause, but caution that socioeconomic conditions or the perceived adequacy of tribal social services or court systems may not be considered in determining whether good cause exists. To assist in this decision, the Department of Interior—Bureau of Indian Affairs (BIA) promulgated interpretative "Guidelines for the State Courts; Indian Child Custody Proceedings." BIA Guidelines, 44 FedReg 67,584, et seq. (Nov. 26, 1979). These "administrative interpretations of statutory terms are given important but not controlling significance." *Batterton v. Francis,* 432 U.S. 416, 424, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448, 456 (1977).

[¶ 27.] Here, once again, we face the question whether a tribe made a timely request to transfer. The Court properly places emphasis on not only when the state proceedings first began, but also when the tribe first received notice that termination of parental rights was the intended disposition. The BIA Guidelines provide that good cause to deny transfer of a child custody proceeding to tribal court exists if, among other things, the proceeding is at an advanced stage when the petition to transfer is received. BIA Guidelines, § C.3.b at 67591. This provision governing timeliness is "designed to encourage the prompt exercise of the right to petition for transfer in order to avoid unnecessary delays." BIA Guidelines § C.3 commentary at 67591. Implicit in this provision is

the consideration of a child's need for permanence and stability in determining whether good cause exists. *In re S.G.V.E.,* 2001 SD 105, ¶ 33, 634 N.W.2d 88, 94; *In re Custody of S.E.G.,* 521 N.W.2d 357, 363–64 (Minn.1994).

[¶ 28.] The good cause exception to the transfer of cases to tribal court continues to be a source of conflict. We have encountered this issue on appeal many times. *See, e.g., In re D.M.,* 2003 SD 49, 661 N.W.2d 768; *In re J.J.,* 454 N.W.2d 317 (S.D.1990) (petition filed four years into litigation); *In re A.L.,* 442 N.W.2d 233 (S.D.1989) (petition filed one year after actual notice to the tribe). South Dakota is not unique in seeing this recurring problem of untimeliness in petitioning for transfer. *In re Maricopa County Juvenile Action,* 171 Ariz. 104, 828 P.2d 1245 (Ct.App.1991) (tribe filed the petition two years after receiving notice of dependency proceeding); *In re Robert T.,* 200 Cal. App.3d 657, 246 Cal.Rptr. 168 (CalCt App 1988) (petition filed one year into litigation); *In re J.W.,* 528 N.W.2d 657, 660 (Iowa App.1995) (case at advanced stage and petition not filed until seven months after tribe received notice); *In re C.E.H.,* 837 S.W.2d 947 (Mo.Ct.App.1992) (petition filed two years into litigation); *In re Wayne R.N.,* 107 N.M. 341, 757 P.2d 1333 (Ct.App.1988) (petition filed six months after service of parties); *State ex rel. State Office for Serv. to Children and Families v. Lucas,* 177 Or.App. 318, 33 P.3d 1001 (2001); *In re Cody S.,* 2000 WL 1184586 (Wis.Ct.App. Aug.22, 2000).

[¶ 29.] In response to these cases, some legal commentators have characterized state court ICWA decisions as founded in bias and distrust. Lorie Graham, *Reparations and the Indian Child Welfare Act,* 25

---

ing preservation of the Indian child's cultural and tribal identity, preferably within the juris-

diction of the child's tribe.

LEGAL STUD F 619 (2001) (criticizing state courts for failing to transfer cases to tribal courts, ignoring statutory placement preferences, and creating judicial exceptions to ICWA); *see also* Jeanne Louise Carriere, *Representing the Native American: Culture, Jurisdiction, and the Indian Child Welfare Act*, 79 IOWA L REV 585 (1994); Christine Metteer, *Hard Cases Making Bad Law: The Need for Revision of the Indian Child Welfare Act*, 38 SANTA CLARA L REV 419 (1998). Others find fault with ICWA itself. Michele K. Bennett, *Native American Children: Caught in the Web of the Indian Child Welfare Act*, 16 HAMLINE L REV 953 (1993) (criticizing ICWA and recommending that state courts continue to consider children's best interests, including child's need for permanency). Recommended solutions include enactment of local legislation to override state court rulings, congressional amendments to ICWA, and a more active role for federal courts in overseeing state court decisions. *See, e.g.*, B.J. Jones, *The Indian Child Welfare Act: In Search of a Federal Forum to Vindicate the Rights of Indian Tribes and Children Against the Vagaries of State Courts*, 73 ND L REV 395 (1997). These solutions, for the most part, have not taken hold or have been unsuccessful.

[¶ 30.] As one scholar put it, "To the extent the ICWA is interpreted to compel decisionmakers to select among irreconcilable interests, the tensions engendered by the Act will only increase." Barbara Ann Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance*, 51 EMORY L J 587, 589 (2002). Nonetheless, this same commentator found that contrary to the suggestion that ICWA is being evaded, "today most state courts and state child welfare agencies seem to be making broad-based efforts to comply with the statutory directives, although the occasional blatant flouting of the Act undoubtedly occurs." *Id.* at 622.

[¶ 31.] To the extent that the good cause exception to the transfer of cases to tribal court continues to create conflict, the answer lies not in faultfinding. The most promising solutions have been those outside of litigation.[4] In addressing this issue head on, the Conference of Chief Justices concludes that the keys are communication, cooperation, and comity. Stanley G. Feldman and David L. Withey, *Resolving State–Tribal Jurisdictional Dilemmas*, 79 JUDICATURE 154 (November 1995). As the Chief Justice of the Arizona Supreme Court pointed out, "Although mutual respect, understanding, and cooperation cannot be legislated, much can be accomplished by person-to-person communication and sharing information among tribal and state judges and court staff." *Id.* at 156.

[¶ 32.] With these goals in mind, several states have created the position of statewide ICWA coordinator. These individuals work with state agencies and tribes to resolve differences and to facilitate and expedite the handling of cases of Native American children. Presently, ten states have statewide coordinators: Alaska, Arizona, California, Colorado, Idaho, Minnesota, Montana, Oregon, Utah, and Washington. These coordinators implement and help to enforce a statewide ICWA compliance plan. They maintain a database of children's cases to document and monitor compliance. They assist in training and coordination between attorneys, social workers, and courts.

[¶ 33.] Congress created ICWA so that, as a general principle, Indian tribes would

---

4. *See, e.g.*, Mary J. Risling, Esq., The Indian Child Welfare Act, California Judges' Benchguide, Section V: Practical Solutions, Using the Act Creatively, p 92–94 (2000).

have authority to determine custody issues involving Indian children. *See generally Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U.S. 30, 52, 109 S.Ct. 1597, 1610, 104 L.Ed.2d 29 (1989). In adherence to this principle, this Court has repeatedly upheld or ordered transfers of custody cases to tribal courts, except in instances where the requests to transfer were untimely or where ICWA prohibits transfer. *In re K.D.*, 2001 SD 77, ¶¶ 8–10, 630 N.W.2d 492, 494 (reversing the trial court's decision to transfer case to tribal court because the mother objected to the transfer); *In re S.Z.*, 325 N.W.2d 53, 56 (S.D. 1982) (under ICWA, objection by either parent will keep jurisdiction in state court).

[¶ 34.] Conflicts between state and tribal officials over Native American children must not continue. For the sake of the children, we must find a resolution to this recurring problem. After all, who should be hearing these custody cases has already been decided. "We must defer to the experience, wisdom, and compassion of the . . . tribal courts to fashion an appropriate remedy in Indian child welfare cases." *Holyfield*, 490 U.S. at 54, 109 S.Ct. 1597 (quoting *In re Adoption of Halloway*, 732 P.2d 962, 972 (Utah 1986)). The answer lies in communication, cooperation, and comity.

## II.

[¶ 35.] Lastly, it must be noted that the Court here employs a questionable standard of review in deciding whether good cause existed not to transfer. Abuse of discretion is the most relaxed standard and improper considering the intent of Congress and the burden imposed on those who oppose an ICWA transfer. Absent good cause to the contrary, 25 USC § 1911(b) creates presumptive Tribal Court jurisdiction in foster care placement and termination of parental rights proceedings. The burden of establishing good cause to deny a transfer is upon the party opposing the transfer. BIA Guidelines, § C.3.d at 67591. If the presumption is in favor of tribal jurisdiction, then mere discretion to override an ICWA transfer is unacceptable.

[¶ 36.] In enacting the jurisdictional provisions of ICWA, Congress intended to have Indian tribes determine custody issues involving Indian children. *In re G.R.F.*, 1997 SD 112, ¶ 14, 569 N.W.2d 29, 32 (citations omitted). It is true that some other courts, like ours, have used the abuse of discretion standard. However, the better reasoned decisions hold that the determination must be supported by clear and convincing evidence of good cause. *In re A.P.*, 25 Kan.App.2d 268, 961 P.2d 706, 713 (1998) (clear and convincing standard); *In re Adoption of S.W.*, 41 P.3d 1003, 1013 (OklaCivApp 2001) (same); *In re M.E.M.*, 195 Mont. 329, 635 P.2d 1313, 1317 (1981). Considering the firm congressional intent behind ICWA, the standard most consistent with the Act requires clear and convincing evidence of good cause for a state trial court to refuse to transfer to tribal court. Although this issue was not briefed and thus should not control the outcome today, henceforth we must abandon the abuse of discretion standard in deciding good cause.

[¶ 37.] MEIERHENRY, Justice, joins this special writing.

ZINTER, Justice (concurring specially).

[¶ 38.] I concur in all but the *obiter dicta* in ¶¶ 22 and 23.

[¶ 39.] GILBERTSON, Chief Justice, joins this special writing.